**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

United States of America,    )
                             )
           Plaintiff,    )  Case No. 1:05-CR-45-003
                             )
    vs.                    )
                             )
Homer Lee Richardson,    )
                             )
          Defendants.   )

O R D E R

      This matter is before the Court on Defendant Homer Richardson's motion to dismiss, or in the alternative, to suppress (Doc. No. 105) and motion for an early proffer of evidence on the existence of a conspiracy from the government (Doc. No. 111).  For the reasons that follow, Defendant's motions are not well-taken and are **DENIED.**

I. Background

      On April 7, 2005, the grand jury in this district returned a twenty-eight count indictment charging Defendants Wilson Moss Graham, Mitchell R. Graham, Homer Lee Richardson, Barton Richardson, Robert L. West, and Robert C. Welti, with conspiracy to commit offenses against or to defraud the United States, in violation of 18 U.S.C. § 371[1] (Count 1), and various other federal tax offenses.  As is relevant here, in addition to the conspiracy count, the indictment also charges Defendant Homer

1

Richardson with four counts of aiding in filing a false tax return, in violation of 26 U.S.C. § 7206(2) (Counts 10, 11, 12, and 17), and three counts of filing a false tax return, in violation of 26 U.S.C. § 7206(1)[2] (Counts 26, 27, and 28).

The indictment arises out of the Internal Revenue Service's investigation into Defendants' alleged use and promotion of domestic and foreign trust schemes marketed by The Aegis Company.  A full explanation of the inner workings of these trusts is not necessary at this time.  The indictment alleges that the Aegis Trust enables the purchaser of the trust product to engage in a series of sham transactions for the purpose of concealing income from the Internal Revenue Service.  The indictment alleges that the Defendants assisted others in transferring their assets to these trusts, made false representations to their clients concerning the taxation of these transactions, and assisted their clients in preparing and submitting false income tax returns to the IRS.  The indictment alleges that the Defendants thus conspired to defraud the United States by impeding, impairing, obstructing, and defeating the governmental functions of the IRS in the ascertainment, computation, assessment, and collection of income taxes.  The indictment also alleges that the Defendants conspired to assist others to prepare and present false income tax returns to the IRS.

2

As the Court will explain in more detail below, Defendant Homer Richardson has for a number of years been the subject of both civil and criminal investigations by the IRS because of his personal use of the Aegis Trust package and promotion to others of the Aegis package.  Richardson now moves the Court to dismiss the indictment on the grounds that in bad faith the IRS instituted a civil investigation for the purpose of collecting evidence for a criminal prosecution in violation of his Fourth and Fifth Amendment rights.  Alternatively, Richardson argues that the Court should suppress evidence seized by the IRS from his business office because the affidavit in support of the search warrant did not establish probable cause.  Richardson further contends that the Aegis trusts were business trusts under Ohio law, and thus were a legitimate form of business organization.  In other words, Richardson apparently argues that the Court should dismiss the indictment because he did not engage in any conduct which violates the Internal Revenue Code. Finally, Richardson claims that he had a First Amendment right to advocate the use of tax shelters.  In a separate motion, Defendant moves the Court to hold a pre-trial evidentiary hearing on whether there was a conspiracy as alleged in Count 1 for the purpose of obtaining rulings on the admissibility of co-conspirators' statements.  The Court takes up these issues seriatim.

3

II. Motion to Dismiss the Indictment

A. Introduction

The pre-indictment proceedings and events between the Defendant and the IRS were complex and intertwined, involving, as noted, both civil and criminal investigations of the Defendant's activities with Aegis.  Before going further, a brief explanation of the organizational structure of the IRS may assist in comprehending these events:

> The IRS splits the responsibility for enforcing the nation's tax laws between its two investigative divisions.  The Criminal Investigative Division ("CID") is charged with investigating criminal violations of the tax code and related federal statutes. CID investigators are called "special agents."  Like many other criminal law enforcement agents, they carry firearms and badges.  In addition, special agents must recite an administrative warning prior to soliciting information from taxpayers. See Beckwith v. United States, 425 U.S. 341, 343, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976) (quoting warning provided by special agents).

> On the other hand, the Examination Division of the IRS is responsible for conducting civil tax audits. Examination Division investigators are known as "revenue agents."  In contrast to special agents, revenue agents do not carry firearms; nor are they required to provide taxpayers with an administrative warning.  Although an Examination Division audit typically concludes with some sort of civil settlement between the IRS and the taxpayer, such an audit may uncover evidence that causes the revenue agent to refer the case to the CID for criminal investigation.  Under IRS regulations, a revenue agent who uncovers a "firm indication of fraud on the part of the taxpayer" must immediately suspend her audit and refer the case to the CID.

United States v. McKee, 192 F.3d 535, 537-38 (6th Cir. 1999)

(quoting United States v. Peters, 153 F.3d 445, 447 (7th Cir.

4

1998)).

      B. <u>The IRS Investigates Defendant's Activities</u>

          1. <u>The Civil Investigation Into</u>
            <u>Defendant's Personal Returns</u>

     The IRS commenced a civil investigation into Defendant's personal tax returns in July 1999. On July 13, 1999, Revenue Agent Bob Listermann mailed Defendant a notice that the IRS had received information that he was involved in a trust arrangement used for tax avoidance purposes. Doc. No. 116, Ex. 6, Morgason Aff. ¶ 2 & Ex. A  This notice concerned the 1996 and 1997 tax years. Attached to the notice was a copy of IRS Notice 97-24, which sets forth the IRS's position on abusive trusts. The notice further advised the Defendant that he had the option of filing amended tax returns in the event he determined that his trust arrangement had any of the abusive elements described in Notice 97-24. In the event he determined that his trust arrangement was not abusive, the notice requested the Defendant to provide a copy of the trust or will instrument, a list of assets of the trust, a list of beneficiaries, a fiduciary declaration, and a list of trustees. As authority for this document request, the notice cited Treasury Regulation 1.6012-3(a)(2).[3]

     Defendant responded to Agent Listermann's notice on July 26, 1999. <u>Id.</u> Ex. B. In his letter, Defendant stated that his legal counsel had assured him that his trust was being

operated in a manner that complied with the Internal Revenue
Code. Therefore, Defendant stated, he saw no need to file
amended tax returns. The remainder of Defendant's response
simultaneously disputed Agent Listermann's authority to obtain
documents pertinent to the trust and inquired for what purpose he
intended to use the documents requested. Defendant expressed
concerns that providing the documents would operate as a waiver
of his constitutional rights. In the end, however, Defendant
refused to provide the documents the agent requested until his
questions and concerns were answered. See id. at 4.

According to Revenue Agent Morgason, Defendant's
response to Agent Listermann's notice, combined with the
indications from his tax returns that he was involved in an
abusive trust, caused Agent Listermann to initiate a civil
examination of the Defendant and his wife. Morgason Aff. ¶ 4.
Agent Morgason states that when CID initiates a criminal
investigation, it puts a code into the IRS tracking system which
informs the civil division of that fact. Agent Morgason states
that no such code was on Defendant's file at this time. Agent
Listermann scheduled an appointment for a civil examination for
September 7, 1999, for which the Defendant did not appear. Id.
Agent Listermann did summon records of the Defendant from third
parties. Id. ¶ 5.

According to Morgason took over Agent Listermann's examination

6

of Defendant in November 1999. Id. ¶ 6. Agent Morgason states that by February 11, 2000, based on the evidence gathered, there were firm indications that the Defendant was involved in criminal activity. Id. ¶ 7. Therefore, the agent states, he closed his civil examination and referred Defendant's case to the Small Business/Self-Employed division to confer with CID to determine whether a criminal investigation should be initiated. Id. Agent Morgason states that the official referral to CID occurred on February 17, 2000. Id. The CID began its criminal investigation on March 8, 2000. Doc. No. 105, Ex. 17.

Although Defendant claims that he actually overpaid taxes for 1996 and 1997, his affidavit in support of his motion, id. Ex. 1, corroborates Agent Morgason's affidavit to the extent that there is no dispute that he did not cooperate with the agents' civil examination. See id. ¶¶ 11, 12. Defendant does not claim in his affidavit that he surrendered any documents to the IRS because of the civil examination of his personal tax returns.

### 2. The March 2001 Search of Defendant's Office

On March 29, 2001, Special Agent Martha Williams obtained a warrant to search Defendant's office, located at 410 West Loveland Avenue, Loveland, Ohio, from Magistrate Judge Jack Sherman.[4] The warrant authorized the seizure of a variety of documents, records, books, electronic data, computer storage

7

data, and computer files connected with possible violations of 18 U.S.C. §§ 371, 1341, 1343, and 1956, 26 U.S.C. §§ 7201, 7206(1), and 7206(2), and 31 U.S.C. § 5316.  An inventory of the items seized during the search of Defendant's office is located at Doc. No. 116, government's exhibit 11.

3. <u>The Civil Investigation of Defendant as a Promoter of Abusive Trusts</u>

Agent Morgason states that he and other revenue agents continued to audit clients of Defendant's and concluded that he was continuing to promote the Aegis trust system.  Morgason Aff. ¶ 9.  Therefore, in June 2002, Defendant was referred to the IRS's Lead Development Center to authorize an investigation of Defendant as a promoter of abusive tax shelters in violation of 26 U.S.C. §§ 6700[5] and 6701.[6]  <u>Id.</u> Sections 6700 and 6701 provide for the imposition of civil penalties for violations. Additionally, 26 U.S.C. § 7408 authorizes the United States to file a civil action to enjoin conduct which constitutes a violation of these sections.  <u>United States v. Gleason</u>, 432 F.3d 678, 682 (6th Cir. 2005).

According to Agent Morgason, the investigation into Defendant's alleged violations of § 6700 began on July 23, 2002. <u>Id.</u> ¶ 10.  Agent Morgason states that this investigation was conducted independent of any ongoing criminal investigation and was developed solely from civil audits and interviews conducted by other Revenue Agents.  <u>Id.</u>  Agent Morgason states that he did

8

not participate in any criminal investigation meetings concerning the Defendant and he did not receive any information from Special Agents concerning the Defendant.  Moreover, he did not issue any administrative summonses during this investigation.  Id.

On October 3, 2002, Agent Morgason notified Defendant that the IRS was considering possible action against him, including an injunction action and imposition of penalties, pursuant to §§ 6700 and 7408.  Morgason Aff. Ex. C.  Agent Morgason scheduled a meeting with the Defendant on October 31, 2002, at which time he was invited to present facts or legal arguments in opposition to the imposition of penalties.  Id. Agent Morgason also issued a Form 4564 document request which, inter alia, asked the Defendant to provide documents relevant to the Aegis Company.  Id. Ex. D.

The meeting between Agent Morgason and the Defendant actually took place on November 8, 2002.  Present at the meeting were Agent Morgason and Richard Hassebrock, a senior attorney for the Small Business/Self-Employed Division, the Defendant and co-defendant Robert Welti.  The Defendant hired a private court reporter to transcribe the meeting.  The transcript of this meeting is Exhibit E to Agent Morgason's affidavit.  The transcript reveals that the Defendant spent about half of the meeting presenting Agent Morgason with information and case law which purportedly endorsed the legitimacy of the business trust.

9

The remainder of the meeting consisted of the Defendant contesting Agent Morgason's authority to ask him questions.  The Defendant in fact refused to answer any of Agent Morgason's questions and he did not provide any documents responsive to the Form 4564 request.  See id.; Morgason Aff. ¶ 12.

Agent Morgason had a follow-up meeting with the Defendant on December 17, 2002.  See Morgason Aff. ¶ 13; Morgason Aff. Ex. G (transcript of meeting). This meeting was essentially a repeat of the November interview - the Defendant contested Agent Morgason's authority and did not answer any substantive questions.  Defendant does not contend anywhere in his papers that he provided any documents to the IRS pursuant to these interviews or the Form 4564 request.

### 4. Civil Injunction Proceedings

On February 5, 2003, the Department of Justice filed a civil complaint against the Defendant pursuant to 26 U.S.C. § 7408 to enjoin him from promoting the Aegis trust scheme.  See United States v. Graham, et. al., Case No. 1:03-CV-96 (S.D. Ohio).  In that case, however, the government did not propound any formal discovery requests to the Defendant.  See Doc. No. 116, Ex. 4, Pahl Aff. ¶ 5.  Moreover, the attorney representing the United States in that case, Michael Pahl, Esq., states that he had no contact with the Justice Department lawyers on the criminal side of the case until after the indictment in this case

10

was issued. Id. ¶ 6. Mr. Pahl states further that his only contact with the trial attorneys in the criminal case was to determine whether he had any documents that would have to be disclosed to the Defendant under the Rules of Criminal Procedure. Id. Finally, Mr. Pahl states that he has not had access to nor has he discussed with any Department of Justice attorney any information covered by the grand jury secrecy provisions of the Rules of Criminal Procedure. Id. ¶ 7.

Judge Watson entered an order on June 23, 2005 preliminarily enjoining Defendant from promoting the Aegis trusts. See Case No. 1:03-CV-96, Doc. No. 100. Permanent injunction proceedings are ongoing.

## 5. Jeopardy Assessment Proceedings

The IRS determined that Defendant and his wife owed back taxes of $164,442 for 1996 and $123,848 for 1997. Morgason Aff. ¶ 18. The events leading up to the jeopardy assessment are as follows. In August 2002, the FBI seized the funds of an entity called Oberland Endeavors, LLC on the grounds that the funds had been used in a ponzi scheme. Morgason Aff. ¶ 16. The United States then instituted an in rem forfeiture action against these funds entitled United States v. Contents of Key Bank Account Number 35390100136, Case No. 3:02-CV-481 (S.D. Ohio). Defendant filed a claim to $450,000 of the funds seized by the government and on or about April 30, 2003, the IRS learned that

11

the magistrate judge assigned to the case was going to order these funds returned to the Defendant. Id. ¶ 17. Agent Morgason states that the civil division did not learn about this impending order from the criminal division of the IRS or the Department of Justice. Id.

Consequently, on May 14, 2003, the civil division obtained permission to file a jeopardy assessment against the Defendant. Id. ¶ 19. A jeopardy assessment permits the IRS, under certain circumstances, to seize property of the taxpayer before a determination of tax liability. Neece v. Internal Rev. Serv., 96 F.3d 460, 462 (10th Cir. 1996); 26 U.S.C. § 6861. The same day, the IRS sent Defendant a notice of the jeopardy assessment and advised him of his right to appeal the assessment to the Area Director, and, after that, to the U.S. District Court in this district. Id.; Morgason Aff. Ex. H; Doc. No. 105, Ex. 29.

On June 5, 2003, Defendant filed a Request for a Collection Due Process Hearing to contest the jeopardy assessment on the grounds that the "math [was] incorrect." Doc. No. 105, Ex. 30. The matter of the jeopardy assessment came before Appeals Officer Mary Jo Cook for a hearing on July 3, 2003. In addition to the Defendant and the appeals officer, present at the hearing were CID special agents Elizabeth Shorten and Nathan Watt. Doc. No. 105, Ex. 31. According to Agent Shorten, she and

12

Agent Watt were at the hearing only for the purpose of providing
security.  Doc. No. 116, Ex. 7, Shorten Aff. ¶ 2.  Defendant
asked Agents Shorten and Watt for identification and then
protested the presence of CID agents at the hearing.  The appeals
officer stated to the Defendant that the agents were not present
in an investigative capacity, but rather to ensure safety.  The
following exchange then took place between the Defendant and
Agent Shorten:

> Defendant: Ok, well, anything you hear today can be
> used against me in a court of law.  Is that
> right?  Huh?
>
> Agent: But you're not under investigation by us.
>
> Defendant: I am not under investigation?
>
> Agent: By Criminal Investigation?  No, as far as I
> know.
>
> Defendant:  Well, I . . .
>
> Agent: Well, you are?
>
> Defendant:  I sure are.
>
> Agent: By Cincinnati?
>
> Defendant: Yeah, this is my document locator number and
> my freeze code, and it shows that I am under
> criminal investigation, 914 code.

Doc. No. 105, Ex. 31, at 4.

As discussed earlier, the Defendant had been under
criminal investigation based on his personal use of the Aegis
Trusts since 2000.  Additionally, the criminal investigation into
the Defendant as a promoter of abusive trusts was initiated in

13

2002. Agent Shorten states, however, that at the time of the
jeopardy assessment appeal hearing, she was not assigned to any
criminal investigation of the Defendant, nor did she have any
knowledge that a criminal investigation was ongoing. Shorten
Aff. ¶ 3. Agent Shorten further states that she did not
intentionally make any false statements or representations to the
Defendant during this hearing. Id. ¶ 4.

On the same day, apparently at the conclusion of the
hearing, the IRS sent Defendant a notice that his appeal of the
jeopardy assessment was denied. The notice further advised him
that he could obtain judicial review of this decision by filing
suit with the U.S. District Court or by filing suit in the U.S.
Tax Court. Morgason Aff. Ex. I.

### 6. U.S. Tax Court Proceedings

A complete recitation of the proceedings in the U.S.
Tax Court involving the Defendant can be found in Richardson v.
Commissioner of Int. Rev., 2006 T.C.M. (RIA) 2006-069
(2006)(upholding assessment of tax deficiencies). For present
purposes, a summary of the proceedings will suffice.

The IRS issued Defendant and his wife a notice of
deficiency on July 10, 2003 for the 1996 and 1997 tax years.
Both Defendant and his wife filed a petition contesting the
notice of deficiency with the U.S. Tax Court. Morgason Aff. ¶¶
22-23. During the Tax Court proceedings, Defendant answered

14

interrogatories and responded to document requests propounded by the IRS. Doc. No. 105, Ex. 2, Arthur Aff. ¶ 2. Defendant also answered questions on direct examination by the IRS's trial attorney, Mr. Hassebrock, during the evidentiary hearing before the Tax Court. Defendant claims that he provided discovery and answered questions not knowing that he was under criminal investigation by the IRS. Of course, this assertion is contradicted by Defendant's own statements to Special Agent Shorten in July 2003 which indicated that he knew he was under investigation by the CID.

Nevertheless, Mr. Hassebrock states in his affidavit that his discovery requests were for the sole purpose of preparing the case for the Tax Court. Doc. No. 116, Ex. 7, Hassebrock Aff. ¶¶ 8-9. Mr. Hassebrock states further that his discovery requests were prepared without any direction from the CID, the Criminal Tax Division of the Office of Chief Counsel, or the Department of Justice. Id. ¶ 10. Mr. Hassebrock points out that the Defendant was represented by counsel during the Tax Court proceedings and did not assert his Fifth Amendment rights at any point during those proceedings. Id. ¶¶ 11, 15. Finally, Mr. Hassebrock denies that CID, the Office of Chief Counsel, or the Department of Justice made any requests to take any action in connection with the Tax Court proceedings. Id. ¶ 16.

7. <u>Miscellaneous Events or Incidents</u>

This section relates to several incidents or events which Defendant cites as evidence of bad faith on the part of the IRS.  The Court's use of the caption "Miscellaneous" is not intended to diminish the alleged importance of the events.  Rather, this section is a "catch-all" for events or incidents which do not appear to be connected and which do not require any extended narrative to explain.

In January 1998, undercover CID agents traveled to Belize and tape recorded their conversations with the Defendant during an Aegis seminar.  Doc. No. 116, Ex. 10, Williams Aff. ¶ 25.

On June 30, 2000, the Chief of the Northern Enforcement Section of the IRS requested the United States Attorney for the Southern District of Ohio to commence a grand jury investigation into possible criminal tax violations by the Defendant.  Doc. No. 123, Ex. A.

Defendant's AMDISA Master File Transcript indicates that he was the subject of a grand jury referral on February 6, 2001.  Doc. No. 105, Ex. 18.

In January and February 2001, two undercover CID agents, apparently posing as potential Aegis clients, went to Defendant's office where they recorded statements of the Defendant.  In addition, Defendant provided the agents with

16

various documents related to establishing an Aegis trust.  <u>See</u>
Doc. No. 116, Ex. 10, Williams Aff., <u>passim</u>.

In March 2005, the IRS filed a tax lien on the
Defendant's home in the Hamilton County Recorder's Office.  Doc.
No. 105, Ex. 35.  The IRS released the lien in October 2005.  <u>Id.</u>
Ex.36.  Defendant contends that the IRS filed the lien to deprive
him of assets with which he could hire experienced counsel for
his defense.

In this case, the government filed a notice that
Defendant's trial counsel may have a conflict of interest because
he also represents other persons in other districts involved with
Aegis who may become witnesses in this case.  <u>See</u> Doc. No. 55.
The Court entered an order (Doc. No. 74) finding no present
conflict of interest.  Defendant, however, contends that the
government's motion indicates that it is coordinating his case
with other civil and criminal cases throughout the country.

C. <u>Analysis of the Motion</u>

As stated, Defendant moves to dismiss the indictment on
the grounds that the IRS violated his Fourth and Fifth Amendment
rights by using a civil investigation as a pretext to collect
evidence for a criminal prosecution.  IRS regulations prohibit an
agent from developing a criminal case under the guise of a civil
investigation.  <u>United States v. McKee</u>, 192 F.3d 535, 541 (6th
Cir. 1999).  The Sixth Circuit has determined that compliance

17

with this regulation is required by the Constitution in order to safeguard the taxpayer's Fourth and Fifth Amendment rights. Id. at 542. Thus, an affirmative misrepresentation by an IRS agent that an investigation is routine when it is really a criminal investigation requires suppression of evidence. Id. In order to obtain suppression of evidence on the grounds of misconduct by the IRS, the Defendant must establish by clear and convincing evidence: 1) that the IRS made affirmative misrepresentations during the course of the investigation; and 2) that because of those misrepresentations the Defendant disclosed incriminating evidence to the prejudice of his constitutional rights. Id. at 542. Clear and convincing evidence is that which "produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the factfinder to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." Cruzan v. Director, Mo. Dept. of Health, 497 U.S. 261, 285 n.11 (1990). Defendant falls well short of meeting his burden in this case.

To the extent that Defendant argues that the indictment should be dismissed or evidence suppressed for the sole reason that the IRS conducted parallel civil and criminal investigations into his activities, the motion is not well-taken. In United States v. LaSalle Nat'l Bank, 437 U.S. 298 (1978), the Court

18

noted that "[t]he legislative history of the Code supports the conclusion that Congress intended to design a system with interrelated criminal and civil elements." Id. at 310.  Indeed, contrary to the Defendant's position, the IRS does not exhibit bad faith in conducting simultaneous civil and criminal investigations; rather, bad faith is more likely to be demonstrated when the IRS abandons the civil objectives of its investigation.  LaSalle, 437 U.S. at 318; United States v. Daffin, 653 F.2d 121, 124 (4th Cir. 1981).

The record before the Court demonstrates that in 1999 the IRS commenced a civil investigation of the Defendant because of his personal use of the Aegis trusts.  This investigation evolved into a criminal investigation in February 2000.  After the referral to the criminal division, the IRS, as it is entitled to do, continued pursuing its civil remedies to recover the tax deficiencies.  Those efforts resulted in the levying of the jeopardy assessment and culminated in Defendant's appeal of that assessment to the U.S. Tax Court.

Similarly, the IRS commenced a civil investigation into Defendant's activities as a promoter of abusive trust schemes.  According to Agent Morgason, this investigation was prompted by audits and interviews of Defendant's Aegis clients.  This investigation also evolved into a criminal matter.  Again, however, the IRS continued to pursue its civil remedies against

19

the Defendant. This, of course, led to the filing of the civil injunction against Defendant pursuant to 26 U.S.C. § 7408. The Court finds no bad faith on the part of the IRS or the government in any of these proceedings.

More importantly, the Defendant has not identified one single document or piece of evidence that he surrendered to the IRS as a result of a misrepresentation by an IRS agent. Agent Listermann summoned documents from third parties, but before Defendant's individual tax return case had been referred for criminal investigation. This was an appropriate use of the IRS's summons authority. LaSalle, 437 U.S. at 318. The abusive tax shelter promotion investigation was developed from information separate from the criminal investigation into Defendant's individual tax returns case. Although the individual tax return criminal investigation was underway when Defendant met with Agent Morgason concerning the abusive tax shelter promotion investigation, Defendant refused to answer any of the agent's questions and did not provide any of the documents the agent requested. The IRS did initiate the civil injunction action against the Defendant, but did not propound any discovery requests to the Defendant in that case.

The IRS did take discovery from Defendant in the Tax Court proceedings. However, there was no deception on the part of the IRS. The discovery requests were not part of an

investigation, but rather were issued in support of the defense of the jeopardy assessment which the Defendant was contesting. Significantly, Defendant's own evidence indicates that at the July 2003 hearing before Appeals Officer Cook he was aware that he was under criminal investigation by the IRS.  Indeed, this fact should have been self-evident in March 2001 when CID agents executed a search warrant on his place of business. Nevertheless, despite knowing that he was the subject of a criminal investigation, and despite being represented by counsel, Defendant did not assert any constitutional rights during the Tax Court proceedings.  Therefore, any information given to the government by the Defendant during these proceedings was voluntarily disclosed.

The closest any statement comes to a misrepresentation is Special Agent Shorten's statement to the Defendant at the jeopardy assessment hearing that he was not under criminal investigation.  Nevertheless, to warrant suppression of evidence, there must be an affirmative representation, i.e., an outright lie.  McKee, 192 F.3d at 542.  Special Agent Shorten's affidavit, however, establishes that she was unaware that the Defendant was under investigation at that time.  Therefore, she did not make an affirmative misrepresentation to the Defendant.  Furthermore, the Defendant was not misled into disclosing incriminating evidence to the IRS because he was aware at the time he was under criminal

investigation.

In short, the record does not support a finding based on clear and convincing evidence the IRS improperly used a civil investigation to develop a criminal prosecution against the Defendant.

This conclusion is not altered by the fact that the IRS gathered statements and evidence through use of undercover agents, as Defendant appears to complain.  The Fifth Amendment does not apply to noncoercive conversations with undercover informants.  United States v. Cope, 312 F.3d 757, 773 (6th Cir. 2002).  There was no Fourth Amendment violation from use of the undercover agents because persons act at their own peril when they assume persons with whom they are dealing are not government agents.  See United States v. White, 401 U.S. 745, 749 (1971); see also id. at 752 ("Inescapably, one contemplating illegal activities must realize and risk that his companions may be reporting to the police."); Lewis v. United States, 385 U.S. 206 (1966)(holding no Fourth Amendment violation where undercover federal narcotics agent entered defendant's home to purchase marijuana).  Therefore, the IRS's use of undercover agents in this case does not require dismissal of the indictment or suppression of evidence.

Defendant also argues, much as one would on a motion for summary judgment, that an Aegis trust is nothing more than a

business trust, which is recognized under Ohio law as a legitimate business arrangement.  See Ohio Rev. Code § 1746.02 ("A business trust is hereby declared to be a permitted form of association for the conduct of business in this state. A business trust is a separate unincorporated legal entity, not a partnership, joint venture, joint-stock association, agency, or any other form of entity.").  The Defendant, however, cannot escape criminal liability merely by assigning a label to the conduct of his affairs.  Rather, the critical inquiry for tax purposes is the substance of the transaction.  See Higgins v. Smith, 308 U.S. 473, 478 (1940)("The Government may look at actualities and upon determination that the form employed for doing business or carrying out the challenged tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the purpose of the tax statute.").

Finally, like the government, the Court sees no particular significance in the date the case was referred to the grand jury for investigation.  For purposes of assessing the IRS's good faith, the critical dates are the date when the revenue agent has developed firm indications of fraud, McKee, 192 F.3d at 542, and the date when the case is referred to the Department of Justice for criminal prosecution.  LaSalle, 437 U.S. at 318.  Moreover, it bears repeating that the Defendant has not identified any evidence he disclosed to the IRS as a result

23

of misrepresentations concerning the status of a criminal investigation.  Defendant has simply failed to make any showing, other than by conjecture, suspicion, and innuendo, that the IRS abused its investigative powers.

Accordingly, Defendant's motion to dismiss the indictment and/or to suppress evidence is not well-taken and is **DENIED**.

### III. Sufficiency of the Affidavit in Support of the Search Warrant

As indicated previously, in March 2001, Special Agent Williams obtained a warrant to search Defendant's place of business for evidence of tax code violations and for evidence of conspiracy, mail fraud, wire fraud, and money laundering. Defendant moves to suppress the evidence seized pursuant to that search warrant on the grounds that the affidavit in support did not establish probable cause, that the warrant was too broad in describing the places to be searched and the items to be seized, and that the Special-Agent was not authorized to apply for a search warrant.  None of these contentions has merit.

It is well-settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression.  United States v. Feldman, 606 F.2d 673, 679 n. 11 (6th Cir. 1979). The probable cause standard is a "practical, non-technical conception."  Illinois v. Gates, 462 U.S. 213, 231,

(1983)(quoting <u>Brinegar v. United States</u>, 338 U.S. 160, 176 (1949)).  Probable cause "has repeatedly been defined in terms of the facts and circumstances known to the officers at the time of the search."  <u>United States v. Pasquarille</u>, 20 F.3d 682, 685 (6th Cir. 1994)(<u>citing United States v. Nigro</u>, 727 F.2d 100, 103 (6th Cir. 1984)(en banc)).  "The test for probable cause is simply whether 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  <u>United States v. Padro</u>, 52 F.3d 120, 123 (6th Cir. 1995)(quoting <u>Gates</u>, 462 U.S. at 238).  Such a probability must be "supported by less than prima facie proof but more than mere suspicion."  <u>United States v. Bennett</u>, 905 F.2d 931, 934 (6th Cir. 1990).

   In <u>Gates</u>, the Supreme Court explained the duties of the issuing magistrate and the reviewing court in determining whether probable cause exists to issue a search warrant.  <u>Gates</u>, 462 U.S. at 238-39.  The issuing magistrate must apply a "totality-of-the-circumstances" test to probable cause issues.  <u>Id.</u> at 238.  This test requires the magistrate to "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information," that probable cause exists. <u>Id.</u>  The reviewing court, in turn, must yield "great deference" to the issuing magistrate.  <u>Id.</u> at 236.  <u>United States v. Leake</u>, 998 F.2d 1359, 1363 (6th Cir.

1993).  The reviewing court's role is limited to "ensur[ing] that the magistrate had a 'substantial basis' for concluding that probable cause existed."  <u>Gates</u>, 462 U.S. at 238-39.  Finally, in determining whether probable cause existed, the reviewing court is limited to reviewing the information contained within the four corners of the affidavit.  <u>United States v. Frazier</u>, 423 F.3d 526, 531 (6th Cir. 2005).

Defendant contends that the Agent Williams' affidavit is insufficient to establish probable cause because it was based on stale information from a search warrant issued the previous year in Chicago and does not allege facts which tend to show that he had committed any crimes.  Defendant further contends that the affidavit is misleading because it omitted pertinent facts, such as the fact that business trusts are recognized as a legitimate business organizations in Ohio, misinformed the magistrate about the state of the law concerning business trusts, and misrepresented other facts.[7]  Defendant's contentions are without merit.

Agent Williams' affidavit contains sufficient factual detail demonstrating probable cause to search Defendant's office. While it is true that a substantial portion of the agent's affidavit overlaps or duplicates an affidavit submitted by another special agent in Chicago the previous year, almost all of the alleged "boilerplate" information concerns the manner in

26

which the Aegis trusts operate to allegedly violate the Internal
Revenue Code.  The alleged duplicative information, however, is
not so much "boilerplate" as it is relevant common background
information.  Because the Aegis trust package is a system or
method of operation concerns about staleness of information are
minimal.  In other words, one would expect that each Aegis trust
would operate in essentially the same manner from year to year.
United States v. Greene, 250 F.3d 471, 481 (6th Cir. 2001)
(holding staleness of information is not significant where there
is evidence of ongoing criminal activity).  Accordingly, the
affidavit is not insufficient because of the alleged boilerplate
allegations.

        Moreover, the affidavit contains sufficient allegations
regarding the Defendant's personal participation in conduct which
gave rise to probable cause to believe he had committed or was
currently committing violations of the Internal Revenue Code.  A
case almost directly on point is United States v. Smith, 424 F.3d
992 (9th Cir. 2005).  In Smith, the defendants solicited clients
to establish Unincorporated Business Organizations, or "UBOs,"
which purportedly would allow them to avoid taxes on income
streamed into them.  The defendants advised their clients to
transfer all of their assets - including businesses, homes, and
cars - into the UBOs.  The defendants also advised their clients
to have their employers issue their paychecks to the UBOs.  The

defendants also advised their clients that they could deduct their personal expenses, such as utility payments, haircuts, laundry, and lawn care, as business expenses.  The defendants also explained to their clients that they would not owe any income tax as long as the UBO did not have a profit at the end of the year.  Id. at 996-97.  The defendants also told their clients that they did not have authority to provide documents related to the UBO's to the IRS because a vote of the trustees was needed. The defendants also insisted on handling any correspondence with the IRS on behalf of the clients for the apparent purpose of stonewalling the IRS's ability to collect relevant documents and records.  Id. at 997.  Based on this conduct, the defendants were indicted, tried, and convicted of various federal offenses, including conspiracy to defraud the United States in the ascertainment, computation, and assessment of income taxes, in violation of 18 U.S.C. § 371, and aiding and assisting in the preparation and presentation of false and fraudulent tax returns, in violation of 26 U.S.C. § 7206(2).  Id. at 998.  The Ninth Circuit affirmed the defendants' convictions in the face of challenges to the sufficiency of the evidence.  Id. at 1008-11.

        Similarly, in this case, Agent Williams' affidavit relates that Aegis representatives, including the Defendant, instructed and assisted their clients in transferring all of their assets into business trusts.  Doc. No. 116, Ex. 10,

28

Williams Aff. ¶ 25(B)(2).  Defendant admitted to an undercover
agent that he had personally transferred his assets into such a
trust, explaining "I own nothing at all.  Technically, I probably
qualify for food stamps."  Id. ¶ 25(E)(1).  The Defendant also
explained to an undercover agent that at the end of the year, the
trust will distribute income earned during the year to holders of
certificates of beneficial interest of the trust, which would be
the grantor of the trust, and report no income for the year.  Id.
¶ 25(b)(3).  Defendant also advised the agent that the trust
could be used to pay for normally non-deductible personal
expenses.  Id. ¶¶ 24, 25(b)(4).  Aegis promoters instructed their
clients to contact Aegis representatives to handle communications
with the IRS.  Id. ¶ 25(d)(1).  Then, according to the affidavit,
the Aegis representatives would refuse to produce any documents
to the IRS until the IRS answered a series of questions to the
representative's satisfaction.  Id.  Defendant was also
apparently in possession of standard letters and affidavits to
provide to clients to use to forestall audits.  Id. ¶ 25(d)(7).
Defendant admitted being part of an "advisory group" to assist
clients in defeating the IRS's attempts to audit Aegis clients.
Id.  Aegis representatives advised clients that they could not
provide records related to the Aegis trusts because the records
were the private property of the organization.  Id. ¶ 25(d)(3).
Defendant also agreed that the Aegis records were private and

could not be produced to the IRS.  Id. ¶ 25(d)(4).

Moreover, Agent Williams' affidavit also established Defendant's ongoing participation in the Aegis trust scheme.  For instance, Defendant admitted to undercover agents that he converted 56 clients to Aegis trusts in November and December 2000.  Id. ¶ 25(G)(3).  Defendant also stated that he had given up his securities license to sell Aegis trusts.  Id. ¶ 25(G)(4).  Defendant stated to undercover agents that he wrote the trust contracts and assisted clients in transferring their assets into the trust.  Id. ¶ 25(G)(5).  Defendant was also in contact with one of the principals of Aegis, Michael Vallone, during meetings with undercover agents.  Id. ¶ 25(f)(1).  Additionally, further investigation into Defendant's bank records indicated that he transferred at least $790,000 to the Aegis Company from 1996 through the time of the application for the warrant.  Id. ¶ 25(F)(2).

In sum, Agent Williams' affidavit shows that Defendant engaged in conduct which was almost identical to the conduct of the defendants in Smith.  If the conduct in Smith was sufficient to sustain convictions for the offenses charged in that case, then there was certainly sufficient probable cause in Agent Williams' affidavit to believe that the Defendant had committed or was committing various tax offenses for the magistrate judge to issue a search warrant.  This is particularly true considering

30

that this Court must give great deference to the magistrate
judge's assessment of the affidavit.

Defendant claims that Agent Williams' affidavit is
misleading, however, because she failed to correctly advise the
magistrate judge on the current state of the law on business
trusts.  As explained earlier, however, the label Defendant
places on his business affairs is not dispositive of the issue of
probable cause.  As the <u>Smith</u> court noted with respect to the
UBO's at issue in that case, while there is nothing inherently
unlawful with a business trust, one may not use a business trust
for the purpose of filing false or fraudulent tax returns.
<u>Smith</u>, 424 F.3d at 1010.  Because Agent Williams' affidavit
sufficiently establishes that the Defendant engaged in conduct
which gave probable cause to believe he had committed or was
committing violations of the Internal Revenue Code, the affidavit
was not misleading simply for failing to advise the magistrate
judge on the current state of the law on business trusts.
Defendant also complains about inaccuracies in the affidavit
concerning mailing labels and computer stands in his office, but
the affidavit is still sufficient even disregarding those
allegations.

Defendant claims that the search warrant was overbroad
in its description of items to be seized.  The Court disagrees.
Agent Williams' affidavit sets forth approximately twenty-two

separate categories of records and documents to be seized, dating from January 1996 through the time of the search, including evidence which may be contained or stored in electronic media. See Doc. No. 116, Ex. 9. The Sixth Circuit has held that, in a business fraud case, an authorization to search for general business records is not overbroad. United States v. Abboud, 438 F.3d 554, 575 (6th Cir. 2006). A warrant may use generic terms if the officer could not know at the time of the application what precise records would contain information concerning the offense. Id. In this case, the warrant was very specific as to the items to be seized. Although the warrant did authorize the seizure of a vast quantity of documents and materials, the Court finds that the evidence the agents wished to seize was all reasonably related to the offenses at issue. Accordingly, the warrant was not invalid due to overbreadth.

Defendant claims that the search warrant was invalid because Agent Williams was not authorized to apply for a warrant. Defendant argues that pursuant to Rule 41(a) of the Federal Rules of Criminal Procedure, only law enforcement officials or an attorney for the government may apply for search warrants. Defendant then points out that pursuant to 26 C.F.R. § 1.274-5T(k)(6)(ii), IRS special agents are not "law enforcement officials." Therefore, Defendant argues that Special Agent Williams was not authorized to apply for a search warrant. This

contention is particularly frivolous.  As the government accurately argues, Title 26 of the Code of Federal Regulations, Section 1.275-5T addresses deductions or credits from income tax for unmarked vehicle expenses incurred by law enforcement officials.  It has nothing whatever to do with an IRS special agent's authority to apply for a search warrant.  In fact, the Code of Federal Regulations specifically authorizes IRS special agents to apply for warrants.  See 28 C.F.R. §§ 60.2, 60.3(7).

Finally, Defendant claims that his activities were protected by the First Amendment.  This argument is without merit as well.  In tax cases, First Amendment protection extends only to pure advocacy.  In this case, as alleged in Agent Williams' affidavit, Defendant's activities go beyond pure advocacy and were sufficient to indicate participation in tax fraud and tax evasion.  See, e.g., United States v. Solomon, 825 F.2d 1292, 1297 (9th Cir. 1987)("[A]ppellants did far more than merely advocate the creation of patent tax shelters.  Rather, they actively performed all the organizational and managerial tasks necessary to create and operate the tax shelters. . . . In sum, because defendants were closely involved in the creation and operation of the tax shelters they can draw no support from . . . the first amendment."); United States v. Kelly, 769 F.2d 215, 217 (4th Cir. 1985)("The claim of First Amendment protection of his speech is frivolous. His was no abstract criticism of income tax

laws.  His listeners were not urged to seek congressional action to exempt wages from income taxation. Instead, they were urged to file false returns, with every expectation that the advice would be heeded.").

In conclusion, the Court finds that Special Agent Williams affidavit sufficiently established probable cause to believe that the Defendant was engaged in activity which violated the Internal Revenue Code.  Accordingly, Defendant's motion to suppress is not well-taken and is **DENIED.**

IV. <u>Motion for an Early Proffer of Evidence of a Conspiracy and Evidentiary Hearing on the Admissibility of Co-Conspirator's Statements</u>

Defendant moves the Court to hold a pretrial evidentiary hearing on the existence of a conspiracy and the admissibility of co-conspirator's statements.  Doc. No. 111. Concerning the admissibility of co-conspirator statements, this Court follows the procedure outlined by the Sixth Circuit in <u>United States v. Vinson</u>, 606 F.2d 149 (6th Cir. 1979):

> The judge may also, as was done here, admit the hearsay statements subject to later demonstration of their admissibility by a preponderance of the evidence.  If this practice is followed, the court should stress to counsel that the statements are admitted subject to defendant's continuing objection and that the prosecution will be required to show by a preponderance of the evidence that a conspiracy existed, that the defendant against whom the statements are hearsay was a participant and that the statement was made in the course and in furtherance thereof.  At the conclusion of the government's case-in-chief, the court should rule on the defendant's hearsay objection.  If the court finds that the government has met the burden of

34

proof described in <u>Enright</u>, it should overrule the objection and let all the evidence, hearsay included, go to the jury, subject, of course, to instructions regarding the government's ultimate burden of proof beyond a reasonable doubt and the weight and credibility to be given to co-conspirators' statements. If, on the other hand, the court finds that the government has failed to carry its burden, it should, on defendant's motion, declare a mistrial unless convinced that a cautionary jury instruction would shield the defendant from prejudice.

If the trial judge does choose to admit the hearsay (a) after the government has established the conspiracy by a preponderance at the trial, or (b) at a "mini-hearing," or (c) conditionally subject to connection, he should refrain from advising the jury of his findings that the government has satisfactorily proved the conspiracy.  The judge should not describe to the jury the government's burden of proof on the preliminary question.  Such an instruction can serve only to alert the jury that the judge has determined that a conspiracy involving the defendant has been proven by a preponderance of the evidence.  This may adversely affect the defendant's right to trial by jury.  The judge's opinion is likely to influence strongly the opinion of individual jurors when they come to consider their verdict and judge the credibility of witnesses.

<u>Id.</u> at 152-53 (internal footnotes omitted).  Therefore, the Court will not require the government to make an early proffer of evidence which it contends establishes a conspiracy. Accordingly, Defendant's motion is not well-taken and is **DENIED.**


**IT IS SO ORDERED**


Date_August 29, 2006_ 	_____s/Sandra S. Beckwith_____
	Sandra S. Beckwith, Chief Judge
	United States District Court

35

1.   Providing:

> If two or more persons conspire either to commit any
> offense against the United States, or to defraud the
> United States, or any agency thereof in any manner or
> for any purpose, and one or more of such persons do any
> act to effect the object of the conspiracy, each shall
> be fined under this title or imprisoned not more than
> five years, or both.

2.   Title 26, Section 7206 provides:

> Any person who-
>
> (1) Declaration under penalties of perjury.--Willfully
> makes and subscribes any return, statement, or other
> document, which contains or is verified by a written
> declaration that it is made under the penalties of
> perjury, and which he does not believe to be true and
> correct as to every material matter; or
>
> (2) Aid or assistance.--Willfully aids or assists in,
> or procures, counsels, or advises the preparation or
> presentation under, or in connection with any matter
> arising under, the internal revenue laws, of a return,
> affidavit, claim, or other document, which is
> fraudulent or is false as to any material matter,
> whether or not such falsity or fraud is with the
> knowledge or consent of the person authorized or
> required to present such return, affidavit, claim, or
> document;
>
> . . .
>
> shall be guilty of a felony and, upon conviction
> thereof, shall be fined not more than $100,000
> ($500,000 in the case of a corporation), or imprisoned
> not more than 3 years, or both, together with the costs
> of prosecution.

26 U.S.C. §§ 7206(1) & (2).


3.   See 26 C.F.R. § 1.6012-3(a)(2)("At the request of the
Internal Revenue Service, a copy of the will or trust instrument
(including any amendments), accompanied by a written declaration
of the fiduciary under the penalties of perjury that it is a true
and complete copy, shall be filed together with a statement by

the fiduciary indicating the provisions of the will or trust
instrument (including any amendments) which, in the fiduciary's
opinion, determine the extent to which the income of the estate
or trust is taxable to the estate or trust, the beneficiaries, or
the grantor, respectively.").

4.   The Court discusses whether the affidavit submitted in
support of the warrant was sufficient to establish probable cause
for the search in Part III, _infra_.

5.   Section 6700 of Title 26 states:

> (a) Imposition of penalty.--Any person who--
>
> (1)(A) organizes (or assists in the organization of)--
>
> (i) a partnership or other entity,
>
> (ii) any investment plan or arrangement, or
>
> (iii) any other plan or arrangement, or
>
> (B) participates (directly or indirectly) in the sale
> of any interest in an entity or plan or arrangement
> referred to in subparagraph (A), and
>
> (2) makes or furnishes or causes another person to make
> or furnish (in connection with such organization or
> sale)--
>
> (A) a statement with respect to the allowability of any
> deduction or credit, the excludability of any income,
> or the securing of any other tax benefit by reason of
> holding an interest in the entity or participating in
> the plan or arrangement which the person knows or has
> reason to know is false or fraudulent as to any
> material matter, or
>
> (B) a gross valuation overstatement as to any material
> matter, shall pay, with respect to each activity
> described in paragraph (1), a penalty equal to the
> $1,000 or, if the person establishes that it is lesser,
> 100 percent of the gross income derived (or to be
> derived) by such person from such activity. For
> purposes of the preceding sentence, activities
> described in paragraph (1)(A) with respect to each
> entity or arrangement shall be treated as a separate
> activity and participation in each sale described in

paragraph (1)(B) shall be so treated. Notwithstanding the first sentence, if an activity with respect to which a penalty imposed under this subsection involves a statement described in paragraph (2)(A), the amount of the penalty shall be equal to 50 percent of the gross income derived (or to be derived) from such activity by the person on which the penalty is imposed.

(b) Rules relating to penalty for gross valuation overstatements.--

(1) Gross valuation overstatement defined.--For purposes of this section, the term "gross valuation overstatement" means any statement as to the value of any property or services if--

(A) the value so stated exceeds 200 percent of the amount determined to be the correct valuation, and

(B) the value of such property or services is directly related to the amount of any deduction or credit allowable under chapter 1 to any participant.

(2) Authority to waive.--The Secretary may waive all or any part of the penalty provided by subsection (a) with respect to any gross valuation overstatement on a showing that there was a reasonable basis for the valuation and that such valuation was made in good faith.

(c) Penalty in addition to other penalties.--The penalty imposed by this section shall be in addition to any other penalty provided by law.

6.    Section 6701 of Title 26 provides:

(a) Imposition of penalty.--Any person--

(1) who aids or assists in, procures, or advises with respect to, the preparation or presentation of any portion of a return, affidavit, claim, or other document,

(2) who knows (or has reason to believe) that such portion will be used in connection with any material matter arising under the internal revenue laws, and

38

(3) who knows that such portion (if so used) would result in an understatement of the liability for tax of another person,

shall pay a penalty with respect to each such document in the amount determined under subsection (b).

(b) Amount of penalty.--

(1) In general.--Except as provided in paragraph (2), the amount of the penalty imposed by subsection (a) shall be $1,000.

(2) Corporations.--If the return, affidavit, claim, or other document relates to the tax liability of a corporation, the amount of the penalty imposed by subsection (a) shall be $10,000.

(3) Only 1 penalty per person per period.--If any person is subject to a penalty under subsection (a) with respect to any document relating to any taxpayer for any taxable period (or where there is no taxable period, any taxable event), such person shall not be subject to a penalty under subsection (a) with respect to any other document relating to such taxpayer for such taxable period (or event).

(c) Activities of subordinates.--

(1) In general.--For purposes of subsection (a), the term "procures" includes--

(A) ordering (or otherwise causing) a subordinate to do an act, and

(B) knowing of, and not attempting to prevent, participation by a subordinate in an act.

(2) Subordinate.--For purposes of paragraph (1), the term "subordinate" means any other person (whether or not a director, officer, employee, or agent of the taxpayer involved) over whose activities the person has direction, supervision, or control.

(d) Taxpayer not required to have knowledge.-- Subsection (a) shall apply whether or not the understatement is with the knowledge or consent of the persons authorized or required to present the return,

affidavit, claim, or other document.

(e) Certain actions not treated as aid or
assistance.--For purposes of subsection (a)(1), a
person furnishing typing, reproducing, or other
mechanical assistance with respect to a document shall
not be treated as having aided or assisted in the
preparation of such document by reason of such
assistance.

(f) Penalty in addition to other penalties.--

(1) In general.--Except as provided by paragraphs (2)
and (3), the penalty imposed by this section shall be
in addition to any other penalty provided by law.

(2) Coordination with return preparer penalties.--No
penalty shall be assessed under subsection (a) or (b)
of section 6694 on any person with respect to any
document for which a penalty is assessed on such person
under subsection (a).

(3) Coordination with section 6700.--No penalty shall
be assessed under section 6700 on any person with
respect to any document for which a penalty is assessed
on such person under subsection (a).


7.  For instance, Defendant contends that the IRS knew his
personal returns were correct and his tax treatment of his trusts
were appropriate.  In addition, Defendant contends that he only
had one meeting with an undercover agent, in January 2001,
instead of meetings in January and February 2001, as stated in
the affidavit.  He also claims that the IRS knew that he had
stopped selling Aegis trusts in January 2000 and had only been
minimally involved in selling offshore trusts.

40